In the Matter of the Accounting of ROBERT J. MORRISSEY, as Executor of PERRY W. MAINE, Deceased.

Surrogate's Court, Broome County, July 29, 1947.

*Frank E. Thomas* for executor, petitioner.

*Louis Z. Green* for Margaret M. Moore and another, and as special guardian for Rose M. O'Sullivan, an infant, and another, an incompetent, respondents.

*Dana B. Hinman* for Cornelia B. Maine, respondent.

PAGE, S. This is a proceeding for the judicial settlement of his account by the executor of the last will and testament of Perry W. Maine, deceased. A construction of said will is necessary in order that the identity of parties entitled to final distribution and their respective shares may be determined.

The testator executed his will June 3, 1930, and died February 27, 1934. In his will he provided a legal life estate in his entire net assets, consisting solely of personal property, for his widow, Dora E. Maine. She died May 21, 1945. The petitioner's present obligation is to render his account and make distribution of the present remainder to the persons legally entitled thereto.

The will provision for disposition of the remainder is contained in paragraph " Third " thereof, which directs a division into four equal portions, of which one is bequeathed to testator's niece, Alta May Andrews; one to testator's brother, Cornelius Maine, who survived the testator but, in 1934, predeceased the life tenant; one to testator's brother, Fred Maine, who also survived the testator but, in 1935, predeceased the life tenant, and one in trust for the benefit of another brother, Bert Maine, who also survived the testator but died in 1939, predeceasing the life tenant.

Alta May Andrews is the only one of the four primary remaindermen to whom a quarter remainder now devolves directly. The disposition of the other three quarters must be according to will provisions, as construed herein, in relation to secondary or substitutional beneficiaries. As to one of the other three quarter remainders, the one for the benefit of testator's brother Bert, there is no possible question because the secondary provision as to this is that it shall be taken by his children, and he was survived by two children.

The difficulty arises as to the shares primarily bequeathed to testator's brothers, Cornelius and Fred. Language of the will as to these two of the quarter remainders is: " * * * and it is my further will that if the said Cornelius W. Maine or Fred S. Maine die before the division as aforesaid then the share of the one so dying shall vest in *the* heirs, share and share alike."

Aside from the consideration of claims of their widows to rank as "heirs ", the criteria in relation to the determination of distributees of Cornelius and Fred are: The former left two children him surviving, namely, Walter Maine and Louise J. Blakely; and the latter left as his distributees only collateral relatives consisting of his brother Bert and nephews and nieces, the same individuals as comprise the distributees of the testator himself, except for any variations there may have been between their respective dates of death.

The main question involved in the construction phase of this proceeding is as to the right of the widows of Cornelius and Fred to be included as " heirs " of their respective deceased husbands.

Before taking up that question, however, it is necessary to resolve the ambiguity arising from the language " *the* heirs " as found in the will, whether this means " my heirs " or " their heirs ". Without entering upon extensive comment thereon, suffice it to say that the testator's intent gatherable from the will as a whole, is quite clearly to the effect that he meant

" their " (of course, respective) heirs. Moreover, it would be most stilted and unnatural on the part of both the testator and the attorney by whom his will was drawn to have meant " *my* heirs " but to have failed to say so. It is contrary to common experience, where the employment of the first personal pronoun, in any of its variations, is appropriate or intended, that there is a failure to employ this pronoun. It is not to be presumed that both the testator and the attorney who drafted his will were thus eccentric. As to this preliminary question of construction, my conclusion is that the testator intended to substitute their respective distributees for his brothers, Cornelius and Fred, in the event either or both of them should predecease the life tenant.

In the present case the gift of remainders to testator's brothers, Cornelius and Fred, provided that, as to each of them, it should be requisite that he survive the testator's widow and life tenant of his estate. The substitutional provision as to each of these quarter remainders was a gift to a class, viz., the " heirs " of Cornelius and Fred respectively. It is necessary to determine the time as of which this class is to be assembled.

The instances where testators have seemed to lack prescience and, therefore, this question has perplexed courts are legion. Some light is found in *Salter* v. *Drowne* (205 N. Y. 204, 216) where we find the Court of Appeals dealing with this question and saying: " ' Where final division and distribution is to be made among a class the benefits of the will must be confined to those persons who come within the appropriate category at the date when the distribution or division is directed to be made. (*Bisson* v. *W. S. R. R. Co.*, 143 N. Y. 125; *Gobel* v. *Wolf*, 113 N. Y. 405–411; *Teed* v. *Morton*, 60 N. Y. 502, 506; *In Re Smith*, 131 N. Y. 239, 247.) * * * ' "

Also see another leading case on this question, viz., *N. Y. Life Ins. & Trust Co.* v. *Winthrop* (237 N. Y. 93); also, *Matter of Weil* (51 N. Y. S. 2d 668, 669 [1944]), wherein Surrogate FOLEY in New York County cited and followed other cases which he regarded as constituting controlling authority on this question.

Pursuant to the elementary principle of construction to the effect that testamentary intent is to be gathered from the testamentary instrument as a whole, the question here seems to be placed beyond any reasonable doubt by the fact that the testator positively required that the primary remaindermen, his brothers Cornelius and Fred, outlive his widow as a condition for qualifying as remaindermen. In the absence of any clear testamentary expression to the contrary. where a condition is attached to a

primary gift, such as surviving an intervening life estate, the testamentary intent is taken to have been that the same condition also attaches to a purely substitutional provision. A terse application of the law of this State on this point is found in *Matter of Fishel* (167 Misc. 145) where the court stated: " The gift of the remainder to the next of kin in this estate is substitutional. The primary gift is to a class, the members of which are to be determined at the termination of the trust. It is only on the non-existence of the members of this class that the alternative gift to the next of kin is to take effect. The primary gift is clearly contingent. The secondary gift is likewise contingent. The testator has indicated an intention to postpone vesting until the termination of the trust. (*New York Life Ins. & Trust Co.* v. *Winthrop,* 237 N. Y. 93.) "

As previously observed, the real question in the present proceeding is: Are the widows of Cornelius and Fred qualified to be classified as " heirs " of their respective deceased husbands? The law of this State is that a surviving spouse was never an heir at law, next of kin or distributee of his or her deceased spouse until the Legislature changed this rule by the enactment of chapter 181 of the Laws of 1938 which became section 47-c of the Decedent Estate Law. (See *Matter of Waring,* 275 N. Y. 6; also *Matter of Wolf,* 284 N. Y. 644, affg. 259 App. Div. 729.)

The answer to the question as to the status of widows of Cornelius and Fred depends entirely upon the law to be applied, whether it is the law before the effective date of section 47-c, of the Decedent Estate Law in 1938, or the law in effect at the date of death of the life tenant in 1945.

In arriving at the conclusion that it is the law as of the latter date, I have done so after carefully considering the applicability of *Matter of Waring* (*supra*), *Matter of Wolf* (*supra*), and other cases wherein the question as to the right of a surviving spouse to be regarded as an " heir " (distributee) of a deceased spouse was presented at times since the 1929 (L. 1929, ch. 229) amendments of the Decedent Estate Law, effective on September 1, 1930 (Decedent Estate Law, § 83, subds. 1–4), were enacted.

The present issue is distinguishable from those presented in *Matter of Waring* (*supra*) and *Matter of Wolf* (*supra*). As was settled in the *Waring* case, the amendments of September 1, 1930, did not constitute a surviving spouse as " next of kin " or an " heir ". This did not occur until the enactment of chapter 181 of the Laws of 1938 (Decedent Estate Law, § 47-c). Section 47-c of the Decedent Estate Law is not retroactive. In the pres-

ent case, however, the widows' status as distributees of their deceased husbands is not dependent upon so construing this section. In the *Wolf* case it would have been requisite to have done so in order to have recognized a surviving spouse as an " heir ", because in that case the date of death of the life beneficiary occurred before the effective date of section 47-c of the Decedent Estate Law, and at the time the *Waring* case was decided (1937) this section had not yet been enacted, and the testator had died *before* September 1, 1930.

It is true that the testator did not expressly state in so many words that wives of his brothers Cornelius and Fred, provided they became their respective widows and outlived testator's own wife as life tenant, should be regarded as qualifying as " heirs " of their respective deceased husbands. He did not specify any particular individuals. Of course, he had a perfect right to have stated his intent as to this question in clear terms. But, since he did not do so, it becomes necessary to endeavor to determine testator's intent by considering his will as a whole, its general testamentary scheme, the cogent surrounding circumstances as they existed at the date he executed it, as well as the law as it was in operation as of both times in question.

It is urged that the will discloses that the testator intended to confine individuals who would derive any benefit from his estate to his own blood relatives only. This is so, except as to the present question of what he meant by " heirs " of his brothers Cornelius and Fred, whether he meant their respective immediate families however they might be constituted at the time of division after the termination of his wife's life tenancy, or that his intent was to refer the whole question to the law as it might be at the division date.

Against the " blood " contention, there are several circumstances which strongly indicate that the testator had no intention of barring anyone who would at the date of division under the then existing law qualify as an " heir " of either his brother Cornelius or Fred. Circumstances as a whole tend strongly to support the conclusion that he intended to include any such as of that time.

Among these considerations is the provision for the final disposition of the quarter remainder after the life trust for testator's brother Bert. In that instance he directed that the remainder should devolve to Bert's " *children* ", thereby definitely excluding Bert's wife. In contrast to this, when he came to providing for a substitutional disposition of the quarter remainders given primarily to his brothers Cornelius and Fred,

he designated their "*heirs*". Along with this circumstance, the date of the will may well be regarded as of some significance. This was on June 3, 1930, a time when the notable and well-publicized amendments of 1929 had been enacted but were not to become effective until September 1, 1930. Testator or, at least, the attorney who drafted his will, or both, undoubtedly were well aware that the ancient rights of dower and courtesy had been abolished (Real Property Law, §§ 189, 190) and distributive shares of not less than one third in any case, and more in some instances, had been provided for a surviving spouse. (Decedent Estate Law, § 83, subds. 1–4.)

Another point in this connection derived from reading the will as a whole and regarding the situation as of its date is that the testator expressly provided that his brother Bert should, under no circumstances, receive anything more than the income of the quarter remainder directed to be held in trust for him. It is fairly to be inferred that the testator positively intended that Bert, had he survived the life tenant, would not share in the division of any portion of the remainder. Related to this is another cogent consideration, namely, the disinheritance by the testator of all his seven nephews and nieces who were the children of his deceased brother George. Upon a determination of the present question which would bar the widow of Fred, these seven nephews and nieces would, contrary to the apparent intent of the testator, automatically become qualified members of the class constituting heirs of testator's brother, their uncle, Fred. The observation in this connection is accentuated by the fact that testator provided a per capita distribution whereby these seven nephews and nieces would now "share and share alike" and thereby, collectively, derive seven twelfths of the quarter remainder primarily provided for the testator's brother Fred.

On the question of probabilities in relation to testamentary intent, the cumulative effect of all these indicia thereof are to be weighed against the single circumstance that testator, *nominatim*, did not designate any person who was not one of his blood relatives. The balance of probabilities seems to be very much to the effect that, when the testator said "heirs" and, at the same time, provided that such heirs should be determined as a class at an uncertain future date, he intended that persons so qualifying would be limited to those answering to the description he has selected at the time he has designated, and pursuant to the applicable law as it existed at such time. It is as logical to presume here as it was in *Gilliam* v. *Guaranty Trust Co.* (186

N. Y. 127, 138) that: "He [grantor] was evidently interested in providing for the life beneficiary in a certain definite manner down to the moment of her death, and did so. But after that apparently he had no desire to limit the succession to his real estate to any particular definite line of persons. He directed generally that it should go to her heirs at law; that is, to the persons whom the law should designate as her heirs when the time arrived. He threw the responsibility of selection upon the law. He took his chances upon the happening of just what did happen."

The legal concept or theory of testamentary dispositions of property comprehends that this is a privilege given by law and to be exercised pursuant to law and governed by law. While it is true that the testator might legally and properly have said in effect, "I direct that the determination of the substitutionary classes of heirs of my brothers, Cornelius and Fred, shall be in accordance with the law as it exists at the date of this my will", this, or anything like it, he did not say.

Authorities are not wanting which hold, in instances where class beneficiaries are designated in a will, that their qualifications are presumed to be in accordance with the law as it is upon the arrival of the time designated by the testator for the determining of a class.

In the case of *Gilliam* v. *Guaranty Trust Co.* (*supra*) the Court of Appeals dealt with the problem of construction of an instrument (deed) in relation to the time as to which a class was to be determined and the law according to what time was to be applied. The instrument there in question was dated in 1853. Statutory provisions in relation to adoptions had been enacted in subsequent years. The last of these had given an adopted child rights of inheritance identical with those of a natural child. On the question of the applicable law, the Court, in this case, said (pp. 133–134):

"Therefore, whatever may have been the legal situation of the appellants at the time when the conveyance was made, as defined in terms of legal phraseology, if before the death of Mrs. Thomas other persons rather than they had become the heirs at law, such latter persons are to be regarded as answering the requirements and taking the benefits of the grant.
* * *

"It is too well established to require any discussion that the relationship of appellants to Mrs. Thomas which originally made them her heirs at law, did not confer any vested right during the life of the sister to the continuance of such heirship,

but that the legislature had the power to change this and provide for a different line of inheritance; also, that a child adopted under the provisions of the act of 1873 giving no right of inheritance is entitled to the benefit of the statute enacted subsequently to the adoption conferring such right. (*Dodin* v. *Dodin,* 16 App. Div. 42; *Theobald* v. *Smith,* 103 App. Div. 200.)

'' The only query is whether the statutes in force at the time when it became necessary to determine the identity of the heirs at law of Mrs. Thomas did or did not make plaintiff one of those heirs.''

Also, in *Matter of Battell* (286 N. Y. 97, 103) the Court of Appeals per RIPPEY, J., stated: '' Since the will provides for a gift over to a class on the termination of the intermediate estate of the niece and the will contains no express direction to the contrary, the members of the class and the shares each take must be determined by the applicable statute, the one in effect as to *his will* and *his* estate at the time of *her* death (*New York Life Ins. & Trust Co.* v. *Winthrop,* 237 N. Y. 93; *Matter of Winslow,* 259 N. Y. 550; *Matter of Devoe,* 171 N. Y. 281; *Matter of Waring, supra*).'' (Emphasis supplied.) In this case the court was divided four to three, but the conflicting opinions agree as to the above-quoted statement of the law. Both applied the same law but differed in its interpretation.

Another authority which I have considered is *Matter of Koch* (282 N. Y. 462). This was a case in which the Court of Appeals in a unanimous decision determined the rule adopted in *Matter of Waring* (275 N. Y. 6, *supra*) to be inapplicable in a case where a fact was that the testatrix lived a short time following the effective date of section 47-c of the Decedent Estate Law in 1938 but made no new will. In the *Koch* case, the court, after giving effect to this circumstance, further said: '' This, moreover, is in accord with the reasoning in *Gilliam* v. *Guaranty Trust Co.* (*supra*) where it was said (at p. 133): ' The general rule applicable to the facts here presented is well established that when property at a future date is to pass to a certain class of persons it will be distributed amongst the persons who compose such class at the date of distribution. (*Paget* v. *Melcher,* 26 App. Div. 12, 18; affd., 156 N. Y. 399; *Matter of Baer,* 147 N. Y. 348; *Bisson* v. *W. S. R. R. Co.,* 143 N. Y. 125; *McGillis* v. *McGillis,* 11 App. Div. 359.) ' ''

In addition to every other consideration it does not affirmatively appear in *Matter of Koch* that the readily discernible testamentary plan of the testator would have been so flagrantly disregarded as in the present case if a construction were to be

adopted whereby the disposition of the remainder would be so contrary to the testamentary plan as a whole. Over and above and in addition to all the above-cited authorities there is to be considered the unanimous host of cases recognizing and giving effect to a discernible and legal over-all testamentary intent as the guiding star of constructions of testamentary provisions.

I, therefore, reach the conclusion, as to the disposition of quarter remainders to testator's brothers, Cornelius and Fred, that their respective widows are entitled to the status of distributees in accordance with the provisions of section 83 of the Decedent Estate Law as affected by section 47-c of the Decedent Estate Law.

Settle decree accordingly.